UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

DAVID R. SCHRATZ,

                  Plaintiff,                              DECISION AND ORDER

vs.                                                03-CV-6610 CJS

JOHN E. POTTER, Postmaster, and UNITED
STATES POSTAL SERVICE,

                  Defendants.

_____

**APPEARANCES**

For the Plaintiff:           Jason Little, Esq.
                                  Christina Agola, Esq.
                                    2100 First Federal Plaza
                                  28 East Main Street
                                  Rochester, NY 14614
                                  Tel: (585) 262-3320

For the Defendants:        John J. Field, A.U.S.A.
                                  United States Attorney's Office
                                  100 State Street, Room 620
                                  Rochester, NY 14614
                                  Tel: (585) 263-6760

**FACTUAL BACKGROUND**

The following factual background is taken from the parties' Statements of Fact. *See*

Western District of New York Local Rule of Civil Procedure 56.1. The facts are not in

dispute except as identified below.

David R. Schratz ("Plaintiff") has a congenital dislocated hip. He was hired as a mail handler with the United States Postal Service in 1982. To obtain that position, Plaintiff completed paperwork for his job application, including a Certificate of Medical Examination. The Certificate included the following language, described by the form as a "brief job description of what position requires employee to do":

> The duties consist of loading and unloading trucks, emptying mail sacks and general laborer work to include: dumping mails, setting up and taking down bag racks and sacking equipment. The applicant will be required to lift sacks of mail weighing up to 80 pounds.

(U.S. Postal Service EEO Investigation Report, No. 1B-145-0024-02 ("EEO Report"), Docket No. 29-6, at 23 (labeled as Exhibit 3B).)[1] Also in that form, was a question, "DO YOU HAVE ANY MEDICAL DISORDER OR PHYSICAL IMPAIRMENT WHICH WOULD INTERFERE IN ANY WAY WITH THE FULL PERFORMANCE OF THE DUTIES OF THE POSITION FOR WHICH YOU ARE APPLYING?" (*Id*.). Plaintiff checked the box next to "No." (*Id*.)

In 1984, Plaintiff "bid"[2] onto a Tour 3[3] position on the south dock of the Rochester Processing and Distribution Center ("Distribution Center") and held that position for approximately sixteen years. However, by 2000, Plaintiff said he was pulled from his normal bid on South Dock and "forced to do jobs I did 20 years ago. That was creating havoc on me physically. So I had to get a note telling me—from the doctor telling me to sit."

---

[1] The parties cited to page seven of the EEO Report, but the quoted language does not appear on that page.

[2] The parties use the phrase "bid onto" a Tour 3 position without explaining what "bid" means in that context. (Def.'s Statement of Facts, Docket No. 29-2, at 2.)

[3] From Defendant's Statement of Facts, Tour 3 is described as a time period from 2:30 p.m. until 11:00 p.m. (Def.'s Statement of Facts, Docket No. 29-2, at 2.)

(Schratz Dep., at 47.) Plaintiff stated at his deposition that he was pulled off his job on the South Dock daily for two years, but could not recall the exact date it started. (*Id*., at 48.)

Plaintiff claims that he wrote numerous grievances and that they "were directly the result of Plaintiff being pulled off of his bid, being forced to walk, and not being allowed to sit, all of which were outside his medical restrictions, of which the defendant was amply aware." (Pl.'s Response to Def.'s Statement of Facts, at 3.) He cites to his deposition testimony, page 50, lines 9-12, which are as follows:

> A. You know, I wrote grievances on it for so many years that I know it was for at least probably a year and a half, two years anyhow. I'd be writing grievances every day.

(Schratz Dep. at 50:9-12.) He also cites to "Vol. II, Ex. C," which consists of a letter from Lori Bauman, CRD, Senior Vocational Rehab Counselor, State Education Department, to Helen D. Matthews, Manager, Employee Relations, U.S. Postal Service (Oct. 7, 1982) ("Bauman Letter"). In that letter, Bauman wrote:

> This letter is intended to serve as certification that David Schratz has been known to the Office of Vocational Rehabilitation, has had the benefit of evaluation and training services through this agency, and for purposes of employment can therefore be considered in the minority category of handicapped.

(Bauman Letter, Docket No. 33-3, at 25.) Bauman went on to state that their records were incomplete, but from the limited information on their computer,

> [i]t would appear that he would be quite capable of handling most any area of work available in a post office or delivery setting. He would probably do best in an environment where he can have a reasonable mix of standing, walking, and sitting. In addition, there has been no known limit on the amount of bending or lifting, so this would not be a factor.

(Bauman Letter, Docket No. 33-3, at 25.) At some time, not specified by Defendant, Plaintiff advised his supervisors that he needed to be able to sit during the work day, but

states he was advised that "Mail handlers cannot sit." (Schratz Dep. at 56-57.) On July 21,

2000, Plaintiff filed an Information for Precomplaint Counseling. (Exhibit D, Docket No. 29-

8, at 2.) In that filing, Plaintiff claimed that the Postal Service had denied him a reasonable

accommodation for his disability. The dispute was referred to the U.S. Postal Service EEO,

and was resolved through mediation with an agreement dated September 14, 2000, stating

that, "David Schratz shall approach his immediate supervisor and request permission to

sit for five (5) minutes as needed." (Settlement Agreement Form, Docket No. 29-8, at 6.)

Plaintiff contends, however, that when he asked to sit, he was written up every time. As a

result, he states that he stopped asking and suffered intense pain in his hips, hands, back

and shoulders. (Pl.'s Response to Def.'s Statement of Facts, Docket No. 33-6, at 5.)

Though no proof has been submitted that Plaintiff grieved the issue of being written up for

asking to sit, Plaintiff states in his affidavit that he went to mediation to resolve the dispute.

(Schratz Aff. ¶¶ 34-35.)

Plaintiff has provided the affidavit of Robert Ippolito, a fellow Postal Service

employee. In his affidavit, Ippolito relates the following:

> 7. In or about 2000, however, Schratz was placed under the "watchful eye"
> of three particular supervisors; Manager of Distribution Operations ("MDO")
> Alton Coleman, Supervisor Distribution Operations ("SDO") Plina Wilson, and
> SDO Reginald Allen. At or about this time, Reginald Allen had been newly
> appointed to a supervisory position.
>
> 8. Management, including Reginald Allen, would assign all the other Mail
> Handlers on the shift to a job function and then pull Schratz off of his bid
> operation, leaving him with no choice of a function.
>
> 9. Management, including Reginald Allen, would then assign Schratz to
> "make work" jobs, for example, hanging empty mail sacks on racks for an
> operation to be worked hours later, when normally an employee from another
> craft would hang these sacks; making Schratz separate empty equipment by
> size and type that would normally be sent to a facility in Pittsburgh,
> Pennsylvania to be done; and sending him as an extra person to the 110

belt.

10. As a result of Schratz performing "make work" duties, he was no longer in his normal work area, and lost the ability to intermittently rest, as he had done so for the prior 14-15 years as a result of his medical condition.

11. Schratz was also removed from his normal break and lunch area, which added considerable additional walking, which would aggravate his medical condition.

12. Because of his having to perform make work duties in various different places, Schratz began to bring a stool in his new work areas, in an effort to accommodate his medical condition, as documented when he was hired.

(Ippolito Aff. ¶¶ 7-12, Docket No. 33-5, at 4.)

On March 21, 2001, Plaintiff was given a letter of warning for failing to follow instructions to stay for overtime work. The letter was signed by Wanda Ferguson-Smith, (A) Supervisor Distribution Opns. Tour III, Rochester, NY, who wrote that Plaintiff violated section 666.51 of the Employees and Labor Relations Manual by the following conduct:

Specifically, on March 5, 2001, at approximately 1930,[4] I attempted to solicit overtime from you as requested by Tour I. You stated that no, you could not, due to the storm that was coming. I advised you that your excuse was not acceptable and that you Would be staying for overtime. You ended your tour at 2297 [sic], disregarding my instructions regarding staying for overtime. When questioned concerning this Incident, you stated that you did not like the question of being asked why you left without permission.

(Letter of Warning (Mar. 12, 2001), Docket No. 29-9, at 2.) The following week, Plaintiff received a seven-day suspension, again for failing to follow instructions. The suspension states in particular that,

[y]ou are charged with failure to follow instructions.

You are in violation of Section 666.51, of the Employee and Labor Relations Manual, which states, "Employees must obey the instructions of their supervisors. If an employee has reason to question the propriety of a

---

[4]Probably a reference to 7:30 p.m.

> supervisor's order, the individual will nevertheless carry out the order and immediately file a protest in writing to the official in charge of the installation, or appeal through official channels."
>
> Specifically, on March 20, 2001, you were instructed to report to the 010 operation. These instructions were given to you at approximately 2:35 p.m. You did not report to the 010 operation until approximately 2:50 p.m. When questioned concerning this, you stated that you had to change out of your winter clothing. I note that on the date of this incident the temperature was 57 degrees and sunny. As an experienced postal employee, you are well aware of your responsibility in reporting promptly for duty. I also note that throughout the rest of the evening on March 20, 2001, you experienced incidents with other supervisors in which you were late returning from breaks. I will not tolerate this type of behavior from you. When questioned concerning this incident, you stated that you went to lock up your jacket.

(Letter of Suspension (Mar. 27, 2001), Docket No. 29-10, at 2.) Plaintiff formally complained, and the issue was resolved on July 20, 2001, when the Postal Service rescinded the suspension and Plaintiff withdrew his complaint. (Exhibit I, Withdrawal of Complaint of Discrimination (Jul. 20, 2001), at 1.)

On April 16, 2001, Dr. Aguirre wrote a letter "To whom it may concern," stating that "David Schratz should continue light duty until further notice. This light duty should consist of no heavy lifting, over 10 pounds, no excessive bending, no prolonged standing, over two hours." (Dr. Aguirre letter (Apr. 16, 2001), Docket No. 29-30, Exhibit Z, at 1.) As of June 20, 2001, Defendant had an assessment from a health care provider (the name is illegible) stating that Plaintiff suffered from a serious health condition, namely, "[a]rthritis & hip dislocation, which disables employee. Also: cervical degenerative disc disease." (Certification of Health Care Provider, Docket No. 29-16, Exhibit L to Def.'s Statement of Facts, at 2.) Moreover, the provider wrote that Plaintiff was "unable to perform any one or more of the essential functions of [his] job…." (*Id.*, at 3.) In a note dated November 8, 2001, Dr. Aguirre indicated that Plaintiff was unable to work on November 7 and that he

was restricted to light duty until November 16. (Dr. Aguirre note (Nov. 8, 2001), Docket No. 29-30, Exhibit Z, at 2.) On November 16, 2001, Dr. Aguirre wrote a note stating that Plaintiff should, "[c]ontinue with seated work for 1½ months." (Dr. Aguirre note (Nov. 16, 2001), Docket No. 29-30, Exhibit Z, at 3.) On January 2, 2002, Dr. Aguirre wrote another note, stating that Plaintiff should remain on, "[l]ight duty work, remain sitting until next appt.—in 6 weeks."[5] (Dr. Aguirre note (Jan. 2, 2002), Docket No. 29-30, Exhibit Z, at 4.)

About June 12, 2002, Defendant assigned Plaintiff to the newly-created MRU, along with twenty-four other light duty employees. When asked at this deposition, "[h]ow did you feel about your transfer to the MRU Unit?" he responded, "I did not like the hours. The job itself was part of the mail handler craft job anyhow and I didn't mind the work that was—the hours were a killer on me." (Schratz Dep. at 62:7-12.) Plaintiff said that he first worked from 2:30 p.m. until 11:00 p.m., and then from 7:00 p.m. until 3:30 a.m. (*Id*. lines 13-16.) The 7:00 p.m. to 3:30 a.m. shift interfered with his ability to "get in better shape" and prevented him from "getting on a regular program of dieting properly," and was "an abrupt change in lifestyle…." (*Id*. lines 19-25.)

On September 12, 2002, Dr. Aguirre wrote a letter "To whom it may concern" in which he stated, "I feel there is no reason for David [Schratz] not to be able to do his assigned job as described on the South Dock Tour 3 description sheet, but should be limited to these tasks." (Richard Aguirre, M.D., letter (Sep. 12, 2002), Docket No. 29-22, at 2.) On October 22, 2002, Dr. Aguirre completed a Return to Duty Medical Certification United States Postal Service. In it, he indicated that Plaintiff could: lift 15-20 pounds for three hours; walk, stand, sit stoop and perform repeated bending for three hours; pull or

---

[5]By the Court's calculations, six weeks from January 2, 2002, was February 13, 2002.

push while carrying for two hours; and reach above his shoulders for two hours. (Return to Duty Medical Certification United States Postal Service, Docket No. 29-23, at 2.) He further indicated that these restrictions would be "life long." (*Id*.) In addition, he wrote the following narrative: "David [Schratz] can walk, stand and sit for 8 hours, but needs a combination of all 3. He can not do a continuous 8 hours of any one alone, but easily can perform his duties if combined mobility [sic]." (*Id*., at 3.)

The contract physician for the Postal Service, Elaine Tunaitis, M.D., noted on April 4, 2003, that Plaintiff: "[n]eeds to be able to sit 10 minutes out of each hour. Standing and walking are limited to 4-5 hours out of each shift. Avoid heavy pushing, pulling or lifting requiring greater than 30-40 pounds of force. (Exhibit T, Docket No. 29-24, at 2.) On June 18, 2003, Dr. Tunatis wrote a note to the Distribution Center plant manager stating that Plaintiff could "perform more vigorous activity than is usually required in the MRU." (Exhibit U, Docket No. 29-25, at 2.) As a result of Dr. Tunatis's June 2003 note, the Acting Plant Manager, Robert Cintron, solicited recommendations from Tour 3 and MRU supervisors with regard to suitable work for Plaintiff. (Exhibit V, Docket No. 29-26, at 2.) Cintron's note indicated that the South Dock position was "no longer a bid." (*Id*.) On July 1, 2003, Cintron proposed offering Plaintiff a split-shift that restored his prior time schedule with work preparing flats in the flat sorter area for four to five hours, followed by working in the MRU. (Exhibit W, Docket No.  29-27, at 2.)

Plaintiff filed a complaint in this Court on December 3, 2003, in which he alleged two causes of action. The first raises a claim under the Rehabilitation Act and contends that Defendant failed to accommodate Plaintiff's "numerous reasonable requests for accom-modation and failed to engage in the interactive process with the Plaintiff once placed on

notice that the job offered to him did not comport with his restrictions." (Compl. ¶ 21.) The second cause of action is for retaliation. (Compl. ¶ 26.) Plaintiff has conceded that "because [he] did not administratively exhaust" his retaliation claim, "the only remaining cause of action" is the first one. (Pl.'s Mem. of Law, Docket No. 33-7, at 1 n.1.)

## STANDARDS OF LAW

### *Summary Judgment*

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).   "[T]he movant must make a *prima facie* showing that the standard for obtaining summary judgment has been satisfied." 11 MOORE'S FEDERAL PRACTICE, § 56.11[1][a] (Matthew Bender 3d ed.). That is, the burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *See Amaker v. Foley,* 274 F.3d 677 (2d Cir. 2001); *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893 (3d Cir.1987) (*en banc*). Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

Once that burden has been met, the burden then shifts to the non–moving party to demonstrate that, as to a material fact, a genuine issue exists. Fed. R. Civ. P. 56(e); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A fact is "material" only if the fact has some affect on the outcome of the suit. *Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. In determining whether a genuine issue exists as to a material fact, the court must view underlying facts contained in affidavits, attached exhibits, and depositions in the light most favorable to the non-moving party. *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Moreover, the court must draw all reasonable inferences and resolve all ambiguities in favor of the non-moving party. *Leon v. Murphy*, 988 F.2d 303, 308 (2d Cir.1993); *Anderson*, 477 U.S. at 248-49; *Doe v. Dep't of Pub. Safety ex rel. Lee*, 271 F.3d 38, 47 (2d Cir. 2001), *rev'd on other grounds Connecticut Dept. of Public Safety v. Doe*, 538 U.S. 1, 123 S. Ct. 1160 (2003); *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946 (3d Cir. 1990). However, a summary judgment motion will not be defeated on the basis of conjecture or surmise or merely upon a "metaphysical doubt" concerning the facts. *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir. 1991) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)); *Knight v. United States Fire Ins. Co.*, 804 F.2d 9 (2d Cir. 1986). Rather, evidentiary proof in admissible form is required. Fed. R. Civ. P. 56(e). Furthermore, the party opposing summary judgment "may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony." *Hayes v. New York City, Department of Corrections*, 84 F.3d 614, 619 (2d Cir. 1996).

Of course, it is well–settled that courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted). However, the general rule holds and a plaintiff may not defeat a motion for summary judgment merely by relying upon "purely conclusory allegations of discrimination, absent any concrete particulars which, if believed, would show discrimination." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997) (citations and internal quotations omitted);  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

### *Rehabilitation Act*

A plaintiff can establish a *prima facie* case under the Rehabilitation Act by showing the following:

> (1) that he is an individual who has a disability within the meaning of the statute, (2) that an employer covered by the statute had notice of his disability, (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations.

*Stone v. City of Mount Vernon*, 118 F.3d 92, 96-97 (2d Cir. 1997). "Claims under the ADA, the Rehabilitation Act, and the NYHRL all proceed under the familiar burden-shifting analysis articulated by *McDonnell Douglas* and its progeny." *Doe v. Bd. of Educ.*, 63 Fed. Appx. 46, 48 (2d Cir. 2003).

***Burden-Shifting Analysis***

As the Second Circuit observed in *Reg'l Econ. Cmty. Action Program v. City of Middletown*, 293 F.3d 35 (2d Cir. 2002),

> claims of intentional discrimination under…the Rehabilitation Act [are analyzed] under the familiar *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), burden-shifting analysis established for employment discrimination cases under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. *See Smith & Lee Assocs., Inc.*, 102 F.3d at 790-91; *Cabrera v. Jakabovitz*, 24 F.3d 372, 380-84 (2d Cir. 1994). Under this scheme, the plaintiffs must first establish a prima facie case of discrimination. *See McDonnell Douglas*, 411 U.S. at 802.

*Reg'l Econ. Cmty.*, 293 F.3d at 49. "If the plaintiffs make out a *prima facie* case, then the burden of production shifts to the defendants to provide a legitimate, nondiscriminatory reason for their decision." *Id*. "If the defendants meet that burden, 'the *McDonnell Douglas* framework…disappears and the sole remaining issue [is] discrimination vel non.'" *Id*. (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142-43 (2000)).

***Reasonable Accommodation Regulation***

The Secretary of Labor has promulgated regulations defining terms used in the Rehabilitation Act. One defines "reasonable accommodation" as follows:

(1) The term reasonable accommodation means:

(I) Modifications or adjustments to a job application process that enable a qualified applicant with a disability to be considered for the position such qualified applicant desires; or

(ii) Modifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position; or

(iii) Modifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities.

(2) Reasonable accommodation may include but is not limited to:

(I) Making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and

(ii) Job restructuring; part-time or modified work schedules; reassignment to a vacant position; acquisition or modifications of equipment or devices; appropriate adjustment or modifications of examinations, training materials, or policies; the provision of qualified readers or interpreters; and other similar accommodations for individuals with disabilities.

(3) To determine the appropriate reasonable accommodation it may be necessary for the covered entity to initiate an informal, interactive process with the qualified individual with a disability in need of the accommodation. This process should identify the precise limitations resulting from the disability and potential reasonable accommodations that could overcome those limitations.

29 C.F.R. § 1630.2(o) (56 F.R. 35734, Jul. 26, 1991).

## ANALYSIS

### Retaliation Claim

Plaintiff has conceded that the retaliation claim contained in the second cause of action does not lie. Accordingly, the Court dismisses the retaliation claim.

### Preclusion of Doctors' Letters

Before analyzing the substantive portion of Defendant's arguments, the Court must address Defendant's request that two doctors' notes from July 2002 be precluded pursuant to Federal Rule of Civil Procedure 37(c)(1) as they were not produced in discovery, but only made an "unexpected appearance" in Plaintiff's opposition papers to the summary judgment motion. (Def.'s Reply Mem. of Law, Docket No. 35, at 4.) Defendant contends that a thorough search of its files did not reveal that the two letters had ever been provided to it. (Woelfel Decl.; McNabb Decl.) Further, Defendant argues that the letters ought to have been identified in response to its interrogatories, but were not. (Schratz's Answers

to Interrogatories, Nos. 15 & 16.)

The letters to which Defendant refers are attached to Plaintiff's Appendix, Vol. II, as Exhibits P and Q. In Exhibit P, the letter from Richard S. Aguirre, M.D., dated July 2, 2002, Plaintiff expresses his concern, "regarding his change in shift as he is afraid how and when he will take his pain medications." In Exhibit Q, the letter from Robert S. Supinski, M.D., dated July 16, 2002, Dr. Supinski wrote that Plaintiff, "is on a very strict regimen of pain control and anti-inflammatory medications. Working between 7pm and 3am would greatly affect his ability to maintain pain level, and have any type of normal lifestyle."

In response to Defendant's Interrogatory No. 14, Plaintiff identified both Dr. Aguirre and Dr. Supinski as physicians he consulted regarding his disability and employment between January 2000 and December 2003. Defendant's Interrogatory No. 15 asked, "[f]or each physician or other medical practitioner identified in Interrogatory No. 14, identify each and every instance in which you spoke with that individual regarding your change of work schedule, your change of duty post from the south dock as well as any modification of medication schedule." Plaintiff's response was, "Plaintiff is not is possession of exact dates which should be memorialized in Plaintiff's medical records." Interrogatory No. 16 asked, "For each and every instance described in Interrogatory No. 15, identify when and to whom you reported such information to any supervisor or other management official of the United States Postal Service or to the Health Service Unit of the Postal Service." In response, Plaintiff wrote, "All documents were forwarded to the defendant."

Federal Rule of Civil Procedure 37(c)(1) reads as follows:

(c) Failure to Disclose, to Supplement an Earlier Response, or to Admit.

   (1) Failure to Disclose or Supplement. If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed

to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless. In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard:

    (A) may order payment of the reasonable expenses, including attorney's fees, caused by the failure;

    (B) may inform the jury of the party's failure; and

    (C) may impose other appropriate sanctions, including any of the orders listed in Rule 37(b)(2)(A)(i)-(vi).

Fed. R. Civ. P. 37(c)(1) (2007). Rule 26(a) and (e) provides in pertinent part as follows:

(ii) a copy—or a description by category and location—of all documents, electrically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment;…

(e) Supplementing Disclosures and Responses.

    (1) In General. A party who has made a disclosure under Rule 26(a)—or who has responded to an interrogatory, request for production, or request for admission—must supplement or correct its disclosure or response:

    (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing;….

Fed. R. Civ. P. 26(a)(1)(A)(ii) & (e)(1) (2007).

Obviously copies of the two doctors' letters should have been given to Defendants in discovery. In view of Defendant's proof that it does not have the letters, it is incumbent on Plaintiff to show the Court when the letters were given to Plaintiff, and, in support of its contention that Defendant had them near the time they were written, when those letters were delivered, and to whom at the Postal Service. Plaintiff has not satisfied his burden of proof and, thus, in the absence of such proof, the Court grants Defendant's request to preclude Plaintiff from using the letters.

***Rehabilitation Act Claim — Failure to Accommodate***

Defendant bases its motion for summary judgment on the argument that Plaintiff has failed to prove he was otherwise qualified to perform his job on the South Dock and that his transfer to the MRU and Defendant's subsequent creation of a split shift for him, was a reasonable accommodation under the Rehabilitation Act.

First, Plaintiff must prove a *prima facie* case under the Act. Plaintiff has shown that he is an individual who has a disability within the meaning of the statute. Undisputed is that Defendant, as an employer, was covered by the statute and had notice of Plaintiff's disability. What remains at issue are the third and fourth elements: (3) that with reasonable accommodation, he could perform the essential functions of the position sought, and (4) that the employer has refused to make such accommodations.

Plaintiff's memorandum of law does not address whether Plaintiff could perform the essential functions of the South Dock job with a reasonable accommodation. Instead, Plaintiff argues that Defendant "fails to show that keeping Plaintiff on the South Dock created an undue hardship." (Pl.'s Mem. of Law, at 6.) The Court notes that as of the September 14, 2000, settlement of Plaintiff's EEO complaint, he was allowed to sit during his work on the South Dock job for five minute intervals. Subsequently, on April 16, 2001, Plaintiff's doctor restricted his lifting to no more than ten pounds. The doctor's later notes restricted Plaintiff even more. The job description for the South Dock mail handling position required, *inter alia*, the ability to "lift sacks of mail weighing up to 80 pounds." (EEO Report, Docket No. 29-6, at 23.) Plaintiff does not raise a material issue of fact with regard to his lifting restriction and the job requirement to lift up to 80 pounds. By establishing that Plaintiff will be unable prove one necessary element of his *prima facie* case, Defendant has

demonstrated its entitlement to summary judgment.

## CONCLUSION

Accordingly, Defendant's motion (Docket No. 29) is granted, and the case is

dismissed.

It Is So Ordered.

DATED:     Rochester, NY
           December 19, 2008

                              ENTER.


                              /s/ Charles J. Siragusa                    ___
                              CHARLES J. SIRAGUSA
                              United States District Judge